1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  JOHN SIMMONS                              CASE NO. 11cv2889 WQH-
                                             MDD
12                              Plaintiff,
        vs.                                  **ORDER**
13
    MORGAN STANLEY SMITH
14  BARNEY, LLC; DOES 1 through 50,
    inclusive,
15
                               Defendants.
16  HAYES, Judge:

17         The matter before the Court is the Motion for Summary Judgment, or in the

18  Alternative, Partial Summary Judgment ("Motion for Summary Judgment") filed by

19  Defendant Morgan Stanley Smith Barney, LLC.  (ECF No. 65).

20                          **PROCEDURAL HISTORY**

21         On December 1, 2011, Plaintiff John Simmons ("Simmons") initiated this action

22  in San Diego Superior Court with a Complaint against Defendant Morgan Stanley

23  Smith Barney, LLC ("MSSB") – his former employer.  (ECF No. 1-1).  Simmons

24  alleges that MSSB unequally compensated him and ultimately fired him on account of

25  his Mormon religion.  The Complaint contains statutory claims for discrimination

26  pursuant to California Government Code section 12940(a) ("FEHA") and 42 U.S.C. §

27  2000e ("Title VII"), and non-statutory claims for fraud, wrongful termination in

28  violation of public policy, and breach of contract.  On December 12, 2011, MSSB

removed the action to this Court.

On May 24, 2012, the Court granted in part a motion filed by MSSB to compel arbitration of Simmons' claims. (ECF No. 37). The Court stayed the case and compelled arbitration as to the non-statutory claims, and declined to compel arbitration of the claims for discrimination in violation of Title VII and FEHA.

On March 5, 2013, MSSB filed the Motion for Summary Judgment, accompanied by declarations and exhibits. (ECF No. 65, 76). MSSB moves for summary judgment on Simmons' remaining Title VII and FEHA claims. MSSB contends that the undisputed facts show Simmons was terminated for repeatedly demonstrating "poor judgment" and for undermining "the inclusive working environment MSSB expected him to foster, despite repeated counseling." (ECF No. 65-1 at 7).

On April 29, 2013, Simmons filed an opposition to the Motion for Summary Judgment (ECF No. 78), along with declarations and exhibits. (ECF Nos. 78, 79, 82-1, 84).[1] Simmons contends that he has come forth with evidence creating a genuine issue of material fact as to whether the instances of "poor judgment" raised by MSSB are merely pretext for religious discrimination.

On May 9, 2013, MSSB filed a reply. (ECF No. 90).[2]

On July 12, 2013, the Court held oral argument. (ECF Nos. 96, 98).[3]

//

//

//

---

[1]On April 30, 2013, Simmons filed a Motion for Leave to File Under Seal certain portions of the exhibits filed on April 29, 2013. (ECF No. 81). On May 6, 2013, MSSB filed a non-opposition. (ECF No. 89). Accordingly, the Motion to File Under Seal (ECF No. 81) is hereby **GRANTED**.

[2]MSSB also filed evidentiary objections pursuant to Federal Rules of Civil Procedure 26(a)(2)(A)(i) and 37(c)(1). (ECF No. 90–2). On May 10, 2013, Simmons filed a response to the objections. (ECF No. 91).

[3]On July 12, 2013, after oral argument, Simmons filed a supplemental declaration with additional evidence. (ECF No. 97). On July 24, 2013, MSSB filed a response to Simmons' newly submitted evidence, along with additional evidence of its own. (ECF No. 99).

Simmons is a member of the Church of Jesus Christ of Latter Day Saints, commonly known as the Mormon Church, and a twenty-six year veteran in the finance industry. (Simmons Decl. ¶¶ 1, 4-5; ECF No. 78-4 at 1). In late 2007, Simmons left his position with Merrill Lynch in Washington, D.C. to become District Manager of Morgan Stanley's Southern California Region.[4] *Id.* ¶ 6.

## I.     Morgan Stanley Smith Barney, LLC

On June 1, 2009, Morgan Stanley's Global Wealth Management Group joined forces with Citigroup's Smith Barney Division, creating the retail brokerage firm MSSB. (Ritzcovan Decl. ¶ 2, ECF No. 76 at 277). "MSSB branch offices are managed by Branch Managers.... Branch Managers are overseen by Complex Managers.... Complex Managers report to Regional Directors.... Each Regional Director reports to a Division Director." *Id.* "An individual holding the functional Regional Director title can also hold the corporate title of Executive Director of Managing Director.... To be elevated from Executive Director to Managing Director, the [Regional Director] must be nominated by his or her Divisional Director...." (*Id.* ¶ 6; *see also* Saperstein Dep. at 175-76, ECF No. 84 at 15-16).

## II.    Mid-2009: Simmons interviewed for Regional Director position

In mid-2009, Doug Kentfield ("Kentfield") became the Divisional Director for MSSB's Western Division – and Simmons' immediate supervisor. (Simmons Decl. ¶ 9-10, ECF No. 78-4 at 2. Shortly thereafter, Kentfield asked Simmons if he was interested in a Regional Director ("RD") position with MSSB. (Kentfield Decl. ¶ 4, ECF No. 65-3 at 2). Simmons expressed interest and Kentfield interviewed him. *Id.* Simmons testified in his deposition that the following occurred during his interview: Kentfield asked him, "'how many children do you have?,'" and Simmons told him "'six'"; Kentfield responded: "'Six kids. Oh, my God. Are you Mormon or Catholic?'";

---

[4]The "District Manager" position for which Simmons was hired "was a precursor to the Regional Director position in the current organizational structure." (Ritzcovan Decl. ¶ 5, ECF No. 27 at 278).

upon telling Kentfield he is Mormon, "the topic changed" and "so did [Kentfield's] demeanor.... [T]he temperament or the mood chang[ed] ... from conversational questions and dialogue to fairly terse, fairly rapid, and the interview didn't go a lot – much longer."  (Simmons Dep. at 65-67, ECF No. 84 at 25-28).

Kentfield interviewed several other managers for the position, ultimately selecting Bill Lee, from Smith Barney.  (Kentfield Decl. ¶ 4, ECF No. 65-3 at 2; Ritzcovan Decl. ¶ 5, ECF No. 76 at 278). Although Kentfield had input in the process, a group of senior executives in New York made the final hiring decisions for RD positions.  (Kentfield Decl. ¶ 4, ECF No. 65-3 at 2).

**III.    June 2009: Simmons reassigned as Divisional Business Development Officer**

In June 2009, the same group of MSSB executives in New York that reassigned Bill Lee as an RD offered Simmons a position as Divisional Business Development Officer ("DBDO").  *Id.*  Simmons was told by Kentfield and Rick Skae, also a Divisional Director, that this was a lateral move and would not affect his compensation or benefits.  (Simmons Decl. ¶ 11, ECF No. 78-4 at 2). Simmons accepted the DBDO position.  *Id.*

Simmons testified in his deposition that, during his time as DBDO, Kentfield made "derogatory statements" about his religion "on several occasions."  (Simmons Dep. at 69, ECF No. 84 at 28).  As a Mormon, Simmons does not drink alcohol. (Simmons Decl. ¶ 2, ECF No. 78-4 at 1).  Simmons testified that, during the summer of 2009, the following incident took place at a New York hotel in the presence of other MSSB executives:

> [T]here were drinks before dinner, there was dinner.  We returned to the hotel lobby, and [Kentfield] said, come on.  Let's all go have drinks.
>
> And I said – I said to him, hey, Doug.  I'm going to run upstairs to call my wife and kids, and that's when he made the comment[:]... 'Well, God knows there's enough of them.  And plus you don't drink anyway.'...
>
> You would have to be a Mormon and be asked how many wives you had to understand what a sensitive topic that would be.

(Simmons Dep. at 71-72, ECF No. 84 at 28).  Simmons testified that he told Rick Skae

about the comment, and that Skae responded: "That's messed up." *Id.* at 76. Simmons testified: "That type of scenario of an uncomfortable parting at night repeated itself over again every time we got together as a group. It was a common type of feeling." *Id.* Simmons testified that, when he "would be ... separating from the group," others in the presence of Kentfield would joke "about not drinking[,] how many wives[,] hah, hah, hah," and that "the talk, the banter, the jokes were not cut off by [Kentfield]." *Id.* at 89. Simmons testified that he "would explain to people ... how offensive that is to me," and that the jokes nevertheless "intensified." *Id.* at 93.

## IV. December 2009: Simmons reassigned as Executive RD

Simmons stated in his declaration that he was informed by "Rick Skae and another high level management executive" in December 2009 that he had been reassigned to Executive RD following a "meeting and decision by MSSB Management, including Andy Saperstein, ... Kentfield, Rick Skae, Bill McMahon, and Charlie Johnston." (Simmons Decl. ¶ 14, ECF No. 78-4 at 3). Kentfield stated in his declaration: "I made the decision to promote Mr. Simmons to [RD] ... [while I] was aware that Mr. Simmons is Mormon." (Kentfield Decl. ¶ 6, ECF No. 65-3 at 3). Simmons' compensation remained the same, and he reported directly to Kentfield. (*Id.* ¶ 16; Simmons Decl. ¶ 14, ECF No. 78-4 at 3).

As an Executive RD, Simmons' compensation "consisted of a salary, which was paid monthly, and an annual bonus based on performance. The other nineteen Regional Directors were compensated in the same way." (Simmons Decl. ¶ 45, ECF No. 78-4 at 7). The base salary for Managing RDs is roughly double the base salary of Executive RDs. (Ritzcovan Decl. ¶ 7, ECF No. 76 at 279). "To be elevated from Executive Director to Managing Director, the RD must be nominated by his or her Divisional Director...." (Ritzcovan Decl. ¶ 6, ECF No. 76 at 277). Saperstein made the "ultimate decision" with respect to the performance bonuses. (*Id.* ¶ 8; Undisputed Fact ("UF") No. 95).

Simmons stated in his declaration that Kentfield continued to make "many

discriminatory comments about [his] religion" after he was reassigned as Executive RD. (Simmons Decl. ¶ 17, ECF No. 78-4 at 3). Simmons stated that "[t]he frequency and intensity of these comments increased over time and the majority and harshest comments came after my reassignment to the Regional Director position." *Id.*

## V. February and March 2010: Complaints regarding Simmons' comments

In March 2010, Simmons gave a presentation on "individual greatness," in which he referenced numerous historical, sports and religious figures, including Mormon prophet David O. McKay. (Simmons Decl. ¶ 30, ECF No. 78-4 at 5). Susan Dixon, another MSSB employee, testified in her deposition that she complained about Simmons' reference to McKay and that she resigned in part because of the presentation. (*Id.* ¶ 31; Dixon Dep. at 29-30, 34-36, ECF No. 76 at 10-14).

In April 2010, Kentfield and Beth Fehmel, a MSSB human resources manager, counseled Simmons and instructed him to limit the sports, historical, and religious references in his speeches. (Simmons Dep. at 155-56, ECF No. 76 at 132-33). Simmons testified in his deposition that Kentfield told him, without Fehmel present, that "[y]ou can never fucking talk about your fucking religion again at this firm because everybody hates your fucking religion." (*Id.* at 161-64; Simmons Decl. ¶ 17, ECF No. 78-4 at 3). Simmons testified that the incident is "seared into my memory." *Id.* In his deposition, Kentfield denied making those remarks. (Kentfield Dep. at 46, ECF No. 76 at 37). Simmons received no written reprimand regarding this matter. (Simmons Dep. at 164, ECF No. 76 at 138).

## VI. Summer 2010: Comments regarding Simmons' religion

Simmons testified in his deposition that, at a dinner with 20-30 MSSB employees during summer of 2010, Jim Tracy, a MSSB executive and "good friend" of Kentfield's, made the following remarks upon learning that Simmons was Mormon: "[W]hat a disaster. My father-in-law is a Mormon. It's a disaster. Does Doug [Kentfield] know you're a Mormon?" (*Id.* at 95-97, ECF No. 84 at 39-40). Simmons testified that when he "said yes," Tracy responded: "[W]ell, I'll bet he didn't when he

hired you." *Id.* at 97.

## VII.  August 2010: Ferrante/Wilson matter

In August 2010, Kentfield told Simmons about an ongoing human resources investigation into Michael Ferrante and Scott Wilson — MSSB employees and friends of Simmons.  (Kentfield Decl. ¶ 10, ECF No. 65-3 at 3).  Ferrante was suspected of having a sexual relationship with a subordinate female employee and sending sexually suggestive e-mails about the relationship to Wilson. (*Id.* ¶ 10; Simmons Dep. at 173-74, ECF No. 76 at 146-47).  Simmons requested, and was permitted, to sit in on Wilson's human resources interview. *Id.* at 179.  At the conclusion of the investigation, Kentfield told Simmons that Ferrante and Wilson had to go.  *Id.* at 194-96.  Simmons disagreed at first, but ultimately agreed to fire them.  *Id.*  Simmons cried while telling Ferrante and Wilson they were fired, and told Ferrante shortly afterwards to "keep your chin up." *Id.* at 200-01.

In September 2010, Kentfield counseled Simmons about his "poor judgment" in his handling of the Ferrante and Wilson matter.  (Kentfield Decl. ¶ 12, ECF No. 65-3 at 4).  Kentfield criticized Simmons for "being soft" with Ferrante and for sitting in on Wilson's human resources interview.  (Simmons Dep. at 213, ECF No. 76 at 166). Kentfield felt Simmons has "exposed the firm to risk." (*Id.*; Kentfield Decl. ¶ 11, ECF No. 65-3 at 4).  Simmons received no written reprimand. (Simmons Decl. ¶ 33, ECF No. 78-4 at 6).

## VIII.  2010 mid-year performance review

In August 2010, Kentfield drafted a mid-year review of Simmons' performance as Executive RD, concluding that he "sometimes meets expectations."  (Def. Ex. A, ECF No. 65-3 at 13).  Kentfield's comments stated in part:

> John is results oriented and has maintained a strong focus on achieving key firm objectives.  John works hard to effectively motivate his employees challenging them to achieve and surpass their stated goals....

> John continues to demonstrate challenges regarding his judgment in both business and personnel matters....  When problems have been identified, John has worked to effectively address individual performance issues....

*Id.* at 12-13.  Kentfield discussed the review with Simmons, but Simmons did not receive a copy.  (Simmons Decl. ¶ 36, ECF No. 78-4 at 6).

**IX.	September 2010: Decision not to promote Simmons**

On September 14, 2010, Fehmel sent an e-mail to Ritzcovan which stated: "Dana, Doug [Kentfield] verified that he will NOT be looking to promote John Simmons to MD - shocker."  (Pl. Ex. 16, ECF No. 97 at 5).

**X.	2010 year-end performance review**

In January 2011, Kentfield drafted Simmons' 2010 year-end review, concluding that Simmons "meets expectations."  (Def. Ex. B, ECF No. 65-3 at 17).  Kentfield's comments stated in part:

> John is strongly results oriented.  He is very focused on achieving the goals established for his region and demonstrates the competitive drive to outperform his peers.  John has worked to build a strong management team and a culture focused on both performance and teamwork....
>
> John and I have had several meetings to address specific developmental issues over the course of the year.  While John may not always agree, he has worked diligently to address my issues of concern.  John has a strong competitive drive, the experience and skill set to be a very effective Regional Director.  I'm concerned about the lapses of judgment John occasionally demonstrates and will be working closely with him to help him improve his decision making process going forward.

*Id.* at 15-16.  Kentfield discussed the review with Simmons, but Simmons did not receive a copy.  (Simmons Decl. ¶ 36, ECF No. 78-4 at 6).  During the meeting, Kentfield commented positively on Simmons' job performance, and noted that the overall review would have been better had it not been for the Ferrante/Wilson and Dixon matters.  (Simmons Dep. at 243-44, ECF No. 76 at 175-76).

**XI.	Early 2011: Las Vegas branch office meeting**

In late 2010 or early 2011, Jeff Branch, a Complex Manager for MSSB, told Simmons that he wanted to hold a meeting over dinner with a group of financial advisors reporting to Doug Ireland, MSSB's Las Vegas Branch Manager.  (Simmons Dep. at 331-33, ECF No. 76 at 200-202).  Branch told Simmons that he did not want to invite Ireland to the meeting.  *Id.* at 330-31.  Simmons testified in his deposition that he had reservations about excluding Ireland, told Branch to inform Ireland, and otherwise

approved the meeting. *Id.* at 332. Branch did not inform Ireland. (*Id.*; Kentfield Decl. ¶ 13). After learning of the meeting, Ireland complained to Kentfield that the meeting had undermined his ability to manage the Las Vegas branch. *Id.* ¶¶ 13-14. As a result, Ireland was reassigned elsewhere. *Id.* ¶ 14.

On February 16, 2011, Kentfield told Simmons that he showed "poor judgment" in approving the dinner, and that he was to blame for Ireland leaving Las Vegas. *Id.* Simmons received no written reprimand.

## XII. February 2011: Simmons sets meeting for Greg Fleming and new recruits

In February 2011, Simmons arranged for Greg Fleming, President of MSSB, to meet with several high level recruits in New York. (Simmons Dec. ¶¶ 38-39, ECF No. 78-4 at 6-7; Simmons Dep. at 361-63, ECF No. 76 at 208-10). After setting the meeting, Simmons arranged background checks for the recruits. *Id.* at 362-63. The recruits ultimately met Fleming in New York "with Kentfield's approval." (Simmons Dec. ¶ 41, ECF No. 78-4 at 7). Kentfield believed Simmons exercised "poor judgment" by setting up such a meeting without first having completed the background checks. (Kentfield Decl. ¶ 16, ECF No. 65-3 at 5). Simmons received no written reprimand.

## XIII. January-February 2011: Simmons complains to Kentfield and Saperstein about compensation

"As of year-end 2010, five RDs reported to Doug Kentfield in the Western Division," including Simmons. (Ritzcovan Decl. ¶ 10, ECF No. 76 at 279). For the year 2010, Simmons received the highest bonus ($680,000) of the five RDs reporting to Kentfield, but the lowest salary. *Id.* The other four, who were Managing RDs and who Ritzcovan stated had more experience than Simmons, earned a salary of over double Simmons' salary. (*Id.*; ECF No. 82-1 at 12-17).

> [Simmons] expect[ed] [his] performance bonus for year 2010 to be paid in January 2011. [Simmons] was informed by Kentfield in or about January 2011 that although [his] bonus amount increased from $630,000 to $680,000 based on [his] superior performance, that unfortunately a large portion of the payment of those monies would be deferred, and would be paid in increments over the next year and into 2012.

(Simmons Decl. ¶ 47, ECF No. 78-4 at 7).

In February 2011, Simmons complained to Kentfield and Saperstein that he was the only RD without the title of Managing RD. (Simmons Decl. at 325-26, ECF No. 194-95). In his declaration, Simmons stated that when he asked Kentfield about being promoted to Managing RD, Kentfield responded, "No." *Id.* at 326. On February 13, 2011, Saperstein sent Simmons an e-mail which stated in part: "Support for the MD must come from your DD[, i.e. Kentfield].... You were not put up for nomination this year." (Pl. Ex. 15, ECF No. 82-1 at 89).

## XIV. March 2011: MSSB terminates Simmons' employment

In March 2011, "shortly after complaining to ... Kentfield and Andy Saperstein about [his] disparate salary," Simmons' employment was terminated by Kentfield "with the concurrence" of Saperstein, Fleming and human resource managers Dana Ritzcovan and Rob Hampton. (Simmons Decl. ¶ 44, ECF No. 78-4 at 7; UF Nos. 84, 229). Kentfield told Simmons that he had lost confidence in Simmons' judgment. (UF No. 86). "Simmons has no reason to believe that Saperstein has any animus toward him based on his religion, and neither Hampton nor Ritzcovan have ever said or done anything indicating to Simmons that they have any ill-will towards Mormons." (UF No. 85). Kentfield stated: "I understand that based on offering the severance package to Mr. Simmons, that we coded [his termination] as 'not for cause.'" (Kentfield Dep. at 32, ECF No. 79 at 31; *see also* ECF No. 79-2 at 35-39 ("Form U5 Uniform Termination Notice for Securities Industries Registration" re: Simmons' termination, dated June 8, 2011)).

Simmons stated in his declaration that he "never received any written warning, written reprimand, or written discipline while employed at MSSB regarding any job performance issues." (Simmons Decl. ¶¶ 18-19, ECF No. 78-4 at 3). During his employment at MSSB, Simmons and his management team "interfaced often with the MSSB Human Resources department regarding employee discipline issues. [Simmons'] experience was such that MSSB had a firmly entrenched progressive discipline process that provided for progressively more severe sanctions." *Id.* ¶ 21.

Simmons' management team had "serious issues with employees that management wanted to terminate but we were prohibited from doing so by HR because they required us to follow steps in progressive discipline." *Id.* ¶ 22.

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *See id.* at 248. The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set out specific facts showing a genuine issue for trial" Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

## DISCUSSION

Under Title VII and FEHA,[5] it is unlawful for an employer or employer's agent "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

---

[5]"California law under the FEHA mirrors federal law under Title VII...." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir. 1998).

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "In responding to a summary judgment motion in a Title VII disparate treatment case, a plaintiff may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's decision, or alternatively may establish a prima facie case under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).

## I.    *McDonnell Douglas*

In this case, Simmons relies on the *McDonnell Douglas* analysis. "Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1123 (9th Cir. 2009) (quotation omitted). "If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. ... If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination." *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 804).

### A.    Prima Facie Case

Simmons may establish a prima facie case of discrimination under the *McDonnell Douglas* framework by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 604 (9th Cir. 2004). "The requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

As a member of the Church of Jesus Christ of Latter Day Saints and a twenty-six year veteran in the finance industry, Simmons belongs to a protected class and was qualified for his position at MSSB. *See Christian Sci. Reading Room Jointly Maintained v. City & Cnty. of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986). Simmons has provided evidence that he was employed as an "Executive RD" with a base salary of less than half that of the other four "Managing RDs" in his region. (Ritzcovan Decl. ¶ 10, ECF No. 76 at 279). Accordingly, Kentfield's decision not to promote Simmons to Managing RD constitutes an adverse employment action. (ECF No. 97 at 5; Saperstein Dep. at 175-76, ECF No. 84 at 15-16); *see also Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) ("We define 'adverse employment action' broadly.... We have recognized that an adverse employment action exists where an employer's action negatively affects its employee's compensation." (collecting cases)). Simmons' subsequent termination also constitutes an adverse employment action. Finally, Simmons has provided evidence that, on several occasions, he was singled out and subjected to jokes and ridicule about his religious beliefs. (Simmons Dep. at 69, 71-72, 89, 83, ECF No. 84).

The Court finds that Simmons has come forward with sufficient evidence to establish a prima facie case. *See Wallis*, 36 F.3d at 889. The burden shifts to MSSB to articulate a legitimate, nondiscriminatory reason for Simmons' compensation and termination. *See McDonnell Douglas*, 411 U.S. at 802.

**B.     Legitimate, Nondiscriminatory Reason**

According to MSSB, Simmons was fired because he "repeatedly showed poor judgment" and "undermined [MSSB's] inclusive working environment." (ECF No. 65-1 at 7). MSSB has produced evidence that Simmons was "repeatedly counseled" by Kentfield for showing "poor judgment" in his public speaking; in his disputes with other employees; and in his handling of the Ferrante/Wilson matter, the Las Vegas dinner, and the Greg Fleming meeting. (Kentfield Decl. ¶¶ 7-12, ECF No. 65-3 at 3-6). MSSB asserts that Simmons' compensation was based on his job title, his length of

experience, and the revenues of his region.

The Court finds that MSSB has sufficiently articulated facially nondiscriminatory reasons for Simmons' compensation and termination. *See, e.g., Pottenger v. Potlach Corp.*, 329 F.3d 740, 746 (9th Cir. 2003) (finding a legitimate nondiscriminatory reason for termination where supervisor lacked confidence that employee "could make the hard decisions necessary" to turn his division of the company around). Accordingly, the burden shifts back to Simmons to show that these reasons are merely pretext for discrimination.

## C.    Pretext

At this step of the *McDonnell Douglas* framework, "[t]he plaintiff ... must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *Dominguez-Curry*, 424 F.3d at 1037 (citation omitted).

### 1.    Same actor inference

MSSB contends "it is undisputed" that Kentfield, while aware of Simmons' religion, acted as the primary decision maker in both Simmons' promotion and subsequent termination. MSSB contends that Simmons must therefore overcome a "strong inference" that his termination was not based upon a discriminatory motive. Simmons contends that the inference is inapplicable in this case because (1) he was reassigned and then terminated by two distinct groups of MSSB executives, and (2) a genuine issue of material fact exists as to whether Kentfield, although part of each group, was actually responsible for both decisions.

"[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) (citing, *inter alia*, *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a

member of that class."), *cert. denied*, 516 U.S. 1078 (1996)).

In this case, the executives involved in reassigning Simmons as Executive RD were not identical to those involved in terminating his employment. The evidence shows that Kentfield, Saperstein, Skae, Bill McMahon and Charlie Johnson were involved in the reassignment decision, while the termination decision was made by Kentfield, Saperstein, Fleming, Ritzcovan and Hampton. While the parties agree that the evidence shows Kentfield was the primary decisionmaker with respect to Simmons' termination, *see* UF 229; ECF No. 90 at 7, the evidence is not clear as to whether Kentfield was the primary decisionmaker for Simmons' reassignment. MSSB submitted a "2009 MD Promotion Write-Up," which shows that Simmons was "[n]ominated" by both John Campbell and Kentfield in October 2009. (ECF No. 99-3 at 2). Kentfield stated in his declaration: "I made the decision to promote Mr. Simmons to Regional Director ... [while I] was aware that Mr. Simmons is Mormon." (Kentfield Decl. ¶ 6, ECF No. 65-3 at 3). However, Kentfield also stated: "While I had input on the hiring decisions for the Regional Directors ..., the final decision as to who would be offered which Regional Director positions was made by a group of senior executives in New York." *Id.* ¶ 4. Simmons stated in his declaration that he was first made aware of the reassignment decision by "Rick Skae and another high level management executive," who told him that the decision was made "as result of a management meeting and decision by MSSB Management, including Andy Saperstein, Doug Kentfield, Rick Skae, Bill McMahon, and Charlie Johnson." (Simmons Decl. ¶ 14, ECF No. 78-4 at 3).

Based upon the conflicting evidence of Kentfield's decisionmaking role in the reassignment decision, the Court cannot conclude that the "same actor" was "responsible" for both actions within the meaning of the same actor inference. *Bradley*, 104 F.3d at 270; *see also Juell v. Forest Pharmaceuticals, Inc.*, 456 F. Supp. 2d 1141 (E.D. Cal. 2006) ("[T]he actors involved in Plaintiff's transfer from Denver to Phoenix and in Plaintiff's subsequent termination were not identical.... The Court accordingly

cannot conclude that Durrett's participation in both actions invokes the same actor inference and requires heightened proof by Plaintiff."); *Pluss v. Safeway*, 2006 U.S. Dist. LEXIS 56013 (D. Ariz. July 25, 2006) (declining to apply the same actor inference where there was no evidence that "the common employee in both actions ... was the sole or primary decision maker [for plaintiff's termination]"). The Court declines to invoke the same actor inference and will not apply a heightened standard of proof for pretext. *See, e.g., Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 221 (9th Cir. 1998) ("Hunt Wesson also disputes that Stipetic was involved in the employment decision, but this dispute is for the trier of fact....").

## 2. Sufficiency of Simmons' evidence

Simmons contends that he has produced "significant" direct and indirect evidence of pretext, including, *inter alia*, numerous "derogatory, ... patently clear, discriminatory, insidious, [and] ugly" comments made by Kentfield. MSSB contends that Simmons cannot show pretext in this case on the grounds that Kentfield's alleged comments constitute "stray remarks" unrelated to the termination or compensation decisions at issue. (ECF No. 65-1 at 24-25).

To survive summary judgment, Simmons "must produce enough evidence to allow a reasonable factfinder to conclude *either*: (a) that the alleged reason for [Simmons'] discharge was false, *or* (b) that the true reason for [his] discharge was a discriminatory one." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996); *see also Zeinali v. Raytheon Co.*, 636 F.3d 544, 552 (9th Cir. 2011) (explaining that a plaintiff can show pretext by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). This burden is "hardly an onerous one," *Noyes*, 488 F.3d at 1170, and "any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (citation omitted).

Direct evidence, which "proves the fact of discriminatory animus without inference or presumption," creates a triable issue as to the employer's motives "even if the evidence is not substantial." *Godwin*, 150 F.3d at 1221. Direct evidence "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). However, where the plaintiff relies on circumstantial evidence, the evidence must be "specific and substantial." *Godwin*, 150 F.3d at 1222. In *Godwin*, female employees were not invited to company hunting and fishing trips; the plaintiff's supervisor commented that he "did not want to deal with another female;" and the company's president made derogatory comments about women. *Id.* The plaintiff in *Godwin* also presented indirect evidence suggesting that the employer's proffered reason for not hiring her – that the selected male applicant had a more pleasant personality – was mere pretext. The Court of Appeals for the Ninth Circuit found this combination of direct and indirect evidence sufficient to raise a genuine issue of fact regarding whether the employer's proffered nondiscriminatory reason was legitimate.

In this case, similar to *Godwin*, Simmons has demonstrated an issue of fact as to pretext both directly, with evidence of discriminatory animus, and indirectly, by demonstrating that MSSB's explanation may not be worthy of credence.

First, Simmons has provided direct evidence creating an issue of fact as to whether a discriminatory reason more likely motivated MSSB. Simmons has provided evidence that could, if found credible, show that Kentfield harbored animus against him because he is Mormon. Simmons points to "repeated and insidious" statements that Kentfield made about Simmons' religion, including references to his "wives", his six children, and his abstinence from alcohol on religious grounds. (Simmons Dep. at 71-72, 76, 89, ECF No. 84 at 28). Simmons testified that Kentfield told him, shortly before his termination: "You can never fucking talk about your fucking religion again at this firm because everybody hates your fucking religion." (Simmons Dep. at 161-64, ECF No. 76 at 132-33). Comments such as these directly suggest the existence of bias and

require no inferences to find discriminatory animus. *See Godwin*, 150 F.3d at 1221.

The Court does not find that these alleged comments constitute "stray remarks" unrelated to the decisional process that courts have held insufficient to establish discrimination. *Cf. Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989) (noting that stray "remarks, ... when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decisionmaker in issue"); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (corporate officer's statement that "we don't necessarily like grey hair" not sufficient to withstand summary judgment in age discrimination suit where comment had no direct relationship to plaintiff). Kentfield stated, and MSSB acknowledges, that he was the primary decisionmaker with respect to Simmons' termination. "Where a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision." *Dominguez-Curry*, 424 F.3d at 1038 (citation omitted); *see also Mondero v. Salt River* Project, 400 F.3d 1207, 1212 (9th Cir. 2005) ("An agent's biased remarks against an employee because of his or her gender are admissible to show an employer's discriminatory animus if the agent was involved in the employment decision."). Moreover, the Court of Appeals for the Ninth Circuit "ha[s] repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry*, 424 F.3d at 1039 (citing, *e.g.*, *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1128 (9th Cir. 2000) (holding that a decisionmaker's remark that "'two Chinks in the pharmacology department were 'more than enough'" was "an egregious and bigoted insult ... that constitutes strong evidence of discriminatory animus on the basis of national origin"); *Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1149 (9th Cir. 1997) (holding that an employer's reference to an employee as a "dumb Mexican" "could be proof of discrimination against [plaintiff] despite their reference to another agent and their utterance after the hiring

decision")).

Simmons also provides circumstantial evidence from which discriminatory intent can be inferred. According to Simmons, when Kentfield learned of his Mormon religion during his first interview for the Regional Director position, the tenor of the conversation changed and the interview quickly drew to a close; Simmons was not offered the job. (Simmons Dep. at 65-67, ECF No. 84 at 25-28). There is evidence that Kentfield failed to intervene when he witnessed other MSSB employees joking about Simmons' religion. *Id.* at 89. "[An employer's] permissive response to harassing actions undertaken by coworkers and supervisors, combined with the absence of [other members of plaintiff's protected class] in the workplace, ... is circumstantial evidence of pretext." *McGinest*, 360 F.3d at 1123. Simmons submits the deposition transcript of David Fields, a former colleague of Kentfield's at Smith Barney, who stated that Kentfield once explained to him: "[I do] not trust people who don't drink" because "it either means [they have] a drinking problem and [cannot] control it, or it mean[s] [they are] overly religious. And those 'holier than thou's,' I don't trust them. They're the first ones to fuck ya." (Fields Dep. at 32, ECF No. 76 at 26). Based on this evidence, a reasonable factfinder could infer that Kentfield harbored animosity towards Simmons because of Simmons' Mormon beliefs.

Simmons has provided indirect evidence creating an issue of fact as to whether MSSB's explanations are worthy of credence. Simmons submits his 2010 mid-year and end-year performance reviews conducted by Kentfield, which are in many ways positive. (Def. Ex. A-B, ECF No. 65-3 at 10-17). Simmons stated, based on his own unsuccessful attempts at firing MSSB employees, that MSSB deviated from its "firmly entrenched progressive discipline process" in his case because he "never received any written warning, written reprimand, or written discipline" prior to his termination. (Simmons Decl. ¶ 18-22, ECF No. 78-4 at 3-4). "A plaintiff may ... raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to her disadvantage." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d

1108, 1117 (9th Cir. 2011). Simmons submits evidence showing that MSSB initially classified his termination as "not for cause," only to change that position after this litigation commenced. "Fundamentally different justifications for an employer's action ... give rise to a genuine issue of fact with respect to pretext." *Pottenger*, 329 F.3d at 740. Although Kentfield stated that Simmons' termination was coded as "not for cause" "based on ... the severance package to Mr. Simmons" (Kentfield Dep. at 32, ECF No. 79 at 31), the weight to give Kentfield's testimony is a question for the trier of fact. *See Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) (explaining that, while "shifting explanations are acceptable when viewed in the context of other surrounding events ... such weighing of the evidence is for a jury, not a judge").

With respect to compensation, the evidence shows that Simmons, out of the five RDs overseen by Kentfield, received the largest performance bonus for 2010 – as determined by Saperstein (UF No. 95) – but the lowest base salary. (Ritzcovan Decl. ¶ 10, ECF No. 76 at 279-80). Ritzcovan stated that in order for an Executive RD to be promoted to Managing RD and receive the corresponding base salary increase, the Executive RD's Divisional Director, e.g. Kentfield, had to first recommend that promotion to Saperstein. (Ritzcovan Decl. ¶ 6). The evidence shows that Kentfield told Ritzcovan that he would "NOT" promote Simmons to Managing RD. (Pl. Ex. 16, ECF No. 97 at 5).

Viewing all the direct and indirect evidence cumulatively, in the light most favorable to Simmons and resolving all inferences in his favor, the Court concludes there is a genuine issue of material fact as to whether the adverse employment determinations at issue were motivated by religious bias rather than the nondiscriminatory explanations proffered by MSSB. *See Noyes*, 488 F.3d at 1170 ("All of the evidence as to pretext ... is to be considered cumulatively.").

## II. Punitive Damages

MSSB moves for summary judgment on Simmons' request for punitive damages on the ground that "there is no merit to his underlying claims." (ECF No. 65-1 at 30).

MSSB contends that Simmons' allegations "amount to a few stray remarks, ... none of which, when taken in context, evidence any bias against Simmons' religion." *Id.*

To recover punitive damages, Simmons must establish oppression, fraud or malice by clear and convincing evidence. *See* Cal. Civ. Code § 3294(a). Viewing all the evidence in the light most favorable to Simmons, the Court concludes that reasonable jurors could find, by clear and convincing evidence, that Kentfield's alleged conduct was oppressive or malicious. Summary judgment on punitive damages is denied.

## III.    Evidentiary Objections

The Court's denial of MSSB's Motion for Summary Judgment is not based on any evidence to which MSSB filed objections. Accordingly, MSSB's objections (ECF No. 90-2) to evidence submitted by Simmons in opposition to the Motion for Summary Judgment are denied as moot.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 65) filed by Defendant Morgan Stanley Smith Barney, LLC is DENIED.

DATED:  July 25, 2013

**WILLIAM Q. HAYES**
United States District Judge